STATE OF CONNECTICUT *v.* ANTHONY BOOTH
(SC 15640)

STATE OF CONNECTICUT *v.* DANIEL BROWN
(SC 15643)

STATE OF CONNECTICUT *v.* JAMIE GOMEZ
(SC 15641)

Callahan, C. J., and Borden, Berdon, Katz and McDonald, Js.

Argued December 9, 1998—officially released September 14, 1999

*Bruce A. Sturman,* public defender, for the appellant (defendant Anthony Booth).

*Jeremiah Donovan,* for the appellant (defendant Daniel Brown).

*Neal Cone,* assistant public defender, for the appellant (defendant Jamie Gomez).

*Paul E. Murray,* supervisory assistant state's attorney, with whom, on the brief, were *Kevin T. Kane,* state's attorney, and *Courtney N. Hewes,* certified legal intern, for the appellee (state).

*Opinion*

MCDONALD, J. After a joint jury trial, the defendants, Anthony Booth, Daniel Brown and Jamie Gomez, were found guilty of murder in violation of General Statutes § 53a-54a,[1] and conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a).[2] The trial court sentenced Booth to a total of sixty years incarceration, Brown to a total of fifty-five years incarceration and Gomez to a total of fifty years incarceration. Each defendant has appealed his judgment of conviction directly to this court, pursuant to General Statutes § 51-199 (b) (3).[3]

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

The jury reasonably could have found the following facts. James "Tiny" Smith and Darrell Wattley fought at a party on July 4, 1995. Wattley sliced Smith's throat with a box cutter, wounding him superficially. On the afternoon of July 13, 1995, Brown and Gomez picked Smith up at the house of Smith's mother, and drove him to Booth's apartment at 93 State Pier Road in New London. When the three men arrived at Booth's apartment, Booth told them that he had asked Angeline Valentin, who lived in the same building, to call Wattley over to the building so that Wattley and Smith could fight. Booth, Brown, Gomez and Smith watched television while they waited for Wattley to arrive. During their wait, and while Brown was rummaging through a grey knapsack, Booth asked Brown whether he "[had worn] gloves when he loaded it." Booth also had a knife in his hand. When Smith asked Booth why he needed the knife, Booth replied: "[D]on't worry about it, we are just going to fight him."

When Valentin called to say that Wattley was on his way, the four men left the building and went outside. Gomez and Brown went to the north side of the building while Smith and Booth went to the south side and hid behind a bush. While they were waiting, Booth was talking on a cellular telephone to either Brown or Gomez. After approximately fifteen minutes, a car arrived and Wattley got out. Wattley walked toward the north end of the building, where Brown and Gomez were waiting. Smith and Booth then entered the building on the south side and began to ascend the stairs. When Smith and Booth reached the third floor, where Valentin's apartment was located, they heard gunshots below. Smith and Booth then ran to exit the building. As they descended the stairs, they saw Wattley lying

face down in the second floor hallway with blood everywhere. Booth then stabbed Wattley a couple of times before Smith and Booth fled the building.[4]

The four men ran to a red Mitsubishi, which was parked on State Pier Road, east of the building. This car was owned by Gomez' girlfriend, Dawn Waterson. Gomez sat in the driver's seat, and Brown, Smith and Booth sat in the passenger seats. As they drove away, Brown said "I robbed that nigger too." Brown had a knife in his lap, which he threw out of the window while they were driving. Gomez drove Waterson's car across town and parked it behind a mall. The four men walked through a cemetery before splitting up. In the cemetery, Booth told them that, if questioned, he and Brown would say that they had been together. In addition, Booth told Smith and Gomez to come up with an alibi. The four men then separated.

A few hours after the murder, Booth approached Valentin in the parking lot of 93 State Pier Road. Booth told her that they shot "him." Booth also told Valentin that he knew that she would not have lured Wattley to the building if she had known that they intended to murder him. Booth also encountered Detective David Gigliotti of the New London police department in the parking lot that night. Gigliotti asked Booth if he knew the victim's identity. Booth responded that he would do a head check to determine if the victim was one of "his people," meaning a member of the 20 Love street gang.

The next day, Booth, Brown, Gomez and Smith went to the house of Gomez' mother to discuss their alibis

[4] When Officer Russell Cavanaugh of the New London police department arrived on the scene, he saw four black males approaching a small red car parked on State Pier Road. He then discovered Wattley, seriously injured, on the second floor of the building. When the ambulance arrived at approximately 10:18 p.m., Wattley was not breathing and had no pulse. Wattley was pronounced dead at the hospital later that evening. Wattley's body had four gunshot wounds, four stab wounds and a small cut on the left side of the neck.

in more detail. In the presence of Brown and Booth, Smith and Gomez agreed to say that they were playing video games most of the night and then went to Lucky's bar at approximately 10 p.m.

A few days after Wattley's murder, police questioned Valentin concerning her knowledge of the crime. After the interview, the police dropped Valentin off at 93 State Pier Road. Booth was in the parking lot of the apartment building at this time. Booth approached Valentin and asked her if she had told the police anything about Wattley's murder. When Valentin answered that she had not, Booth warned her to "keep it that way."

On July 18, 1995, Booth met with Matthew Burgard, a reporter for the New London Day. Booth told Burgard that he was concerned that the news stories about Wattley's murder implied that it was gang related. As president of the New London chapter of 20 Love, Booth wanted to assure Burgard that Wattley's death was not gang related; Booth stated that "none of us [was] even around when [the murder] happened."

On July 24, 1995, when Gomez was questioned by police, he claimed that, on the night of July 13, 1995, he and his cousin, Smith, played video games and drank beer at Waterson's house. Gomez further claimed that, at approximately 10 p.m., he and Smith got a ride to Lucky's bar from Anita Torres, Monique Gilbert and Kristin Cerreto. There was evidence, however, that Smith and Gomez did not arrive at Lucky's bar until after 11 p.m.[5]

All three defendants argue on appeal that the trial court improperly granted the state's motion to join the

---

[5] Anita Torres, Monique Gilbert and Kristin Cerreto all testified that they picked up Gomez and Smith on the night of July 13, 1995, and dropped them off at Lucky's bar. Torres, Gilbert and Cerreto then drove straight to the bank so that Gilbert could withdraw cash from the automatic teller machine. Her receipt from the withdrawal showed that the transaction occurred at 11:19 p.m.

defendants' trials. In addition, each defendant raises distinct issues relevant to his own case on appeal. Booth argues that the trial court improperly admitted an out-of-court statement made by Brown under the coconspirator exception to the hearsay rule. Brown argues that the trial court improperly: (1) admitted testimony concerning his membership in 20 Love; (2) refused to allow him to recall Waterson as a witness for further questioning on a subject explored during direct examination by the state; (3) admitted the results of a gunshot residue test and blood stain analysis; and (4) denied his motion for an acquittal or for a new trial based on juror misconduct. Finally, Gomez argues that the trial court improperly: (1) concluded that the evidence presented at the probable cause hearing was sufficient to sustain a finding that there was probable cause to believe that Gomez intended to murder Wattley; (2) concluded that the state produced sufficient evidence to sustain his convictions; and (3) permitted certain out-of-court statements made by Booth to be used by the jury in the case against Gomez. We affirm the judgments of conviction.

I

All three defendants claim that the trial court improperly granted the state's motion for joinder and improperly denied their pretrial motions for severance. The following additional facts are relevant to this claim. Before the trial began, the state moved for joinder of the trials of the three defendants. Each defendant objected,[6] and the court held a hearing. At the hearing, the state argued that, pursuant to what is now Practice Book

---

[6] Each defendant was represented at trial by individual counsel. Throughout this opinion, we attribute statements made in the trial court by a particular defendant's counsel to the defendant himself.

§ 41-19,[7] and the precedents of this court, a joint trial is the favored method of dealing with multiple defendants charged with the same crime or crimes, absent a showing of substantial prejudice by the defendants. Booth objected to joinder, claiming that the defendants would have antagonistic defenses. Booth indicated that he intended to point the finger at Brown, claiming that Brown discharged the bullets that killed Wattley, and at Smith, who allegedly inflicted the fatal stab wounds. Gomez also objected to joinder, claiming, in general terms, that the defendants' antagonistic defenses and the jury's tendency to assume guilt by association would prejudice him during the trial. Finally, Brown claimed that both he and Gomez planned to implicate Booth and Smith in the murder. Brown stated that he did not object to being tried jointly with Gomez, but that a joint trial with Booth would be highly prejudicial to his case.

The trial court determined that "no substantial injustice would result from joining the cases," and granted the state's motion for joinder. The court concluded that the defendants merely had different interpretations of the evidence, but that "there would be no great discrepancies as to what the evidence . . . might be." The trial court further concluded that the issues in the cases were straightforward and simple, and that, due to the similarity of the evidence against the three defendants, it was logical to join the cases, instead of trying each defendant individually. In the court's view, any possible prejudice during the trial could be eliminated through "special instructions" to the jury.

Before jury selection began, the defendants moved to sever the trials. Brown made the motion, asking "the

---

[7] Practice Book § 41-19, formerly § 829, provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

court to reconsider one more time the question of joinder of these defendants." Brown repeated the same arguments that he had made during the hearing on the state's motion for joinder, claiming that Booth was responsible for the murder and that Booth planned to implicate Brown.[8] Brown stated: "I can't imagine a more antagonistic set of defenses than our pointing the finger at Booth and Booth pointing the finger at us." Gomez joined this motion, reminding the court that he also took an exception to the court's original ruling on joinder. The trial court denied the motion, concluding that nothing had changed since the motion for joinder had been granted. Thereafter, at trial, when Gomez' statement to the police was admitted into evidence, Brown and Booth renewed their objections to joinder.[9] At that time, the trial court assured the defendants that the jury would be instructed that the evidence of Gomez' statement to the police should be used only in the case against Gomez, and that it could not be used in the case against Booth or Brown.[10]

On appeal, the three defendants claim that the trial court abused its discretion in granting the state's motion for joinder and in denying their motions for severance. Each defendant also claims that he was substantially

---

[8] Booth also objected at this point, stating: "If [Brown] says he's going to try and prove that we did it . . . I'm going to be really objecting there."

[9] Booth noted "that the joinder of this trial and the three defendants' defenses, and the proffer of evidence by the state, to wit, specifically, in this case . . . Gomez' statement . . . will work unfair prejudice against . . . Booth." Brown added: "[I]f the jury determines that . . . Gomez' [statement to the police] was a false alibi, it's going to be very difficult for people to separate . . . Brown from that false alibi."

[10] The issue of joinder arose at one other point during the trial, when records of Booth's prior felony convictions were offered into evidence for impeachment purposes. Both Brown and Gomez objected at this time. Brown stated: "This is the problem with joining cases. I mean, this is one of those problems that arises." Brown and Gomez did not make a motion for severance or ask the court to reconsider the joinder of the defendants' cases at this time.

prejudiced during the development of the joint trial. We disagree, and conclude that the trial court did not abuse its discretion in conducting a joint trial.

"[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Citations omitted; internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 158–59, 640 A.2d 572 (1994); accord *State* v. *Walton*, 227 Conn. 32, 56, 630 A.2d 990 (1993); *State* v. *Smith*, 201 Conn. 659, 668–69, 519 A.2d 26 (1986); see also *State* v. *Vinal*, 198 Conn. 644, 648, 504 A.2d 1364 (1986).

"The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded." *State* v. *White*, supra, 229 Conn. 158. "[W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants." *State* v. *Vinal*, supra, 198 Conn. 649. "The discretion of the court is necessarily exercised before the trial begins and with reference to the situation as it then appears to the court." *State* v. *Smith*, supra, 201 Conn. 669; accord *State* v. *McCarthy*, 130 Conn. 101, 103, 31 A.2d 921 (1943). Therefore, we must review the trial court's decisions to grant the state's motion for

joinder and to deny the defendants' motions for severance based upon the evidence before the court at the time of the motions.

Under this standard, we conclude that the trial court did not abuse its discretion in determining that the defendants' defenses were not antagonistic. "When . . . the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant, the defenses are sufficiently antagonistic to mandate separate trials." *State* v. *Vinal*, supra, 198 Conn. 652. "To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." (Citations omitted.) *United States* v. *Romanello*, 726 F.2d 173, 177 (5th Cir. 1984). Compare *State* v. *Holup*, 167 Conn. 240, 246–47, 355 A.2d 119 (1974) (defenses antagonistic) with *State* v. *Varricchio*, 176 Conn. 445, 449–50, 408 A.2d 239 (1979) (defenses not antagonistic).

The trial court's conclusion that the defendants' defenses were not antagonistic did not constitute an abuse of discretion. "[I]t is the party's responsibility to present information to the court from which it can determine whether the defenses are going to be antagonistic or the evidence will unduly prejudice either or both defendants." *State* v. *Varricchio*, supra, 176 Conn. 448. The defendants' mere assertion that they intended to blame each other for the crime is not sufficient to overcome the presumption of a joint trial. See id., 449–50 (defenses not antagonistic even though defendants asserted they were). At the hearing on the state's motion for joinder, none of the defendants offered any information to substantiate his claim of antagonistic defenses. If we were to allow a defendant to prevent joinder merely by claiming that the defenses would be

antagonistic as a result of cross finger pointing, joint trials would never occur. See, e.g., *State* v. *Smith*, supra, 201 Conn. 670 (defendants may not "conjure up possibilities" to support motion for severance, and severance is necessary "only when it clearly appears that a joint trial will probably be prejudicial to the rights of the accused"); see also *United States* v. *Villegas*, 899 F.2d 1324, 1347 (2d Cir.), cert. denied, 498 U.S. 991, 111 S. Ct. 535, 112 L. Ed. 2d 545 (1990) ("vague and general assertion [of antagonistic defenses] is entirely insufficient to show the kind of substantial prejudice that warrants a new trial for denial of severance"). A joint trial "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once." *Parker* v. *United States*, 404 F.2d 1193, 1196 (9th Cir. 1968), cert. denied, 394 U.S. 1004, 89 S. Ct. 1602, 22 L. Ed. 2d 782 (1969). "[W]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons." (Internal quotation marks omitted.) Id., 1197. Based on the claims and the information before the trial court when it heard the state's motion for joinder, we conclude that the trial court did not abuse its discretion in determining that the defenses were not antagonistic and in granting the state's motion.

For the same reasons, the court did not improperly deny the defendants' pretrial motions to sever the trial. The trial court's conclusion that neither the evidence nor the defendants' arguments had changed since the motion for joinder had been granted was not an abuse of discretion. Based on the record before the trial court when the defendants made their pretrial motions to sever the trial, we conclude that the trial court did not

abuse its discretion in denying those motions. Consequently, we reject the defendants' foregoing claims

Our inquiry, however, does not end there. The defendants also claim that, as the trial developed, they were substantially prejudiced by the joint trial. We have held that, even after concluding that there was no abuse of discretion in granting pretrial motions to join trials, an appellate court must also consider whether, as the trial developed, the joinder of the trials resulted in substantial injustice to the defendants. See *State* v. *White*, supra, 229 Conn. 160; see also *State* v. *DeWitt*, 177 Conn. 637, 646, 419 A.2d 861 (1979) ("It is clear that the question of prejudice arising from the actual conduct of a joint trial is a question independent of the proper resolution of a pretrial motion for a separate trial. If the denial of the . . . motion has in fact resulted in substantial injustice to the accused, a new and separate trial is required."). This second inquiry is required because "exceptional cases may arise where a motion for separate trials has been denied, but during or after the joint trial it appears that the joint trial is resulting or has resulted in substantial injustice to one or more of the accused. In such circumstances, justice to the prejudiced accused requires that he be afforded a new trial." *State* v. *Holup*, supra, 167 Conn. 245.

Each of the defendants claims that he was substantially prejudiced by the joint trial. First, Brown claims that he was substantially prejudiced because antagonistic defenses developed at trial. Second, Booth claims that the evidence of Gomez' false alibi substantially prejudiced him at trial. Finally, Gomez claims that he was substantially prejudiced by the "rub off" effect of the many statements that were admissible at trial against Brown and Booth but not against Gomez.

A

Brown claims that the joinder of trials prejudiced him because the defendants had antagonistic defenses

at trial. Specifically, he claims that the jury could not have accepted the core of his defense—that Booth and Smith lay in wait for Wattley and followed him into the building—and Booth's testimony that he had heard shots in the building from an unknown source.[11] Brown also claims that Booth's testimony that Brown was not even present at the crime scene at the time of the murder was so preposterous that it prejudiced Brown's defense.

To require severance, the defenses must be so incompatible that, in accepting one defense, the jury must necessarily reject the other. See *State* v. *Vinal*, supra, 198 Conn. 652 (finding joinder inappropriate in cases involving excessive finger pointing). Differing trial strategies are not enough to render the defenses incompatible and completely antagonistic, thus necessitating separate trials. See *State* v. *Walton*, supra, 227 Conn. 58. "Antagonism between defenses is insufficient; the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating the other does not generate the kind of prejudice that mandates severance." (Citations omitted; internal quotation marks omitted.) *United States* v. *Sherlock*, 865 F.2d 1069, 1081 (9th Cir. 1989).

The defenses that developed at trial were not antagonistic. Since Brown neither testified nor called any witnesses, he presented his defense through his cross-examination of the witnesses and closing arguments. The testimony of Smith and Booth with respect to

---

[11] Although Brown claims on appeal that his defense included finger pointing at Booth, we are unable to discover any point in the trial transcript at which Brown blamed Booth for Wattley's murder. Instead, Brown stated in closing argument that Smith was solely responsible for the murder, and that Booth, Brown and Gomez believed that they were meeting Wattley so that Smith and Wattley merely could fight.

Brown's presence at the scene during the murder conflicted. Smith, testifying as a state's witness, said that Brown was present during the murder. Booth denied this assertion. Brown did not attempt to resolve the discrepancy. Brown asserted that, regardless whether Brown was at the crime scene, he did not participate in, or have prior knowledge of, Wattley's murder. In closing argument, Brown stated: "Smith says that he and . . . Booth lay in wait in the south part of the building while . . . Brown and . . . Gomez went to the north side of the building . . . . Booth [who testified on his own behalf] says that they [were] tired of waiting, that . . . Brown and . . . Gomez [were] tired of waiting and left to get something to eat and came back after it was all over. Whichever is true, I would suggest to you that the evidence does show that, while they were there, what [Gomez, Brown and Booth] thought was going to happen was that [Smith] was going to get his fistfight with . . . Wattley."

Gomez' defense also relied upon his cross-examination and closing arguments because Gomez did not testify or present any witnesses to testify about his whereabouts on the night of the murder. Gomez claimed that the state had not produced sufficient evidence for the jury to convict him of the crimes charged.

Booth presented his defense through his testimony, during which he admitted that he was present during the murder, but claimed that he played no role in it, and that he had no prior knowledge of a plan to murder Wattley. Booth claimed that Smith and some unknown persons killed Wattley.

The defenses of each defendant are not incompatible because the jury reasonably could have accepted all the defenses simultaneously, finding that there was insufficient evidence to convict Gomez, that Brown and Gomez played no part in the crime and that Booth

was present but did not participate in the murder. The defenses were not antagonistic and we, therefore, reject Brown's claim of prejudice.

Brown also claims that he was prejudiced by the many statements made by his codefendants that were admitted into evidence during the trial. Specifically, Brown points to Booth's statements to Valentin, police and reporters, as well as Gomez' false alibi, and further claims that the court's instructions to the jury not to consider these statements in the case against Brown did not remove their prejudicial effect.[12] We disagree.

"The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Griffin*, 175 Conn. 155, 160, 397 A.2d 89 (1978); accord *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." *Richardson* v. *Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987).

In the present case, Brown has failed to demonstrate how he was prejudiced by Booth's out-of-court statements, none of which implicated Brown, and the evidence concerning Gomez' alibi. The trial court had cautioned the jury that it should not consider Booth's

---

[12] In making this argument, Brown does not differentiate between statements that the court allowed the jury to consider in the case against him, and those that the court did not allow the jury to consider in the case against him. Instead, Brown makes a broad, sweeping argument that joinder of the trials was improper because the statements generally were devastating to his case and that the trial court's cautionary instructions had failed to erase the prejudicial effect of those statements.

admissions to the police and reporters[13] and the evidence of Gomez' alibi[14] in the case against Brown. In the absence of any indication that the jury disregarded the court's instructions, we fail to see how the impeachment of Gomez' alibi or the statements made by Booth could substantially have prejudiced Brown.

## B

Booth claims that the evidence of Gomez' false alibi substantially prejudiced him during the trial. Relying on *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), Booth claims that the admission of Gomez' out-of-court statement concerning his activities on the night of the murder implicated Booth in the crime. Since Gomez did not testify at the trial, Booth contends that he was deprived of his sixth amendment right to confront the witnesses against him.[15] We reject this claim.

In *Bruton*, the United States Supreme Court held that, in a joint trial, the admission of a codefendant's confession that implicates the defendant violates the

---

[13] The trial court did allow the jury to consider Booth's second "parking lot" statement to Valentin in the case against Brown. See part IV C of this opinion. However, Brown does not distinguish this statement from the other statements.

[14] This court previously has rejected a defendant's contention that joinder is inappropriate when his codefendant's alibi witnesses have been impeached—making the codefendant appear guilty and allegedly prejudicing the defendant himself—on the ground that there was no prejudice because the trial court had instructed the jury to consider each defendant separately. *State* v. *White*, supra, 229 Conn. 160. We concluded that "even if we assume that the impeachment evidence hurt [the codefendant's] case, there is no indication that it played any part in the jury's consideration of [the other defendant's] case." Id.

[15] The confrontation clause of the sixth amendment to the United States constitution, made applicable to the states by the fourteenth amendment; *Pointer* v. *Texas*, 380 U.S. 400, 403, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); guarantees, inter alia, the right of a criminal defendant "to be confronted with the witnesses against him . . . ." The right of confrontation includes the right to cross-examine witnesses. See id., 404, 406–407.

confrontation clause of the sixth amendment because the defendant cannot cross-examine the confessor. Id., 126. The court found that the admission of such a confession is prejudicial to the defendant even when the jury is instructed that the confession should not be used against the defendant: "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (Citations omitted.) Id., 135–36. In *Richardson* v. *Marsh*, supra, 481 U.S. 208, the United States Supreme Court limited *Bruton* to its facts, holding that it applies only when the defendant is " 'expressly implicat[ed]' " in a codefendant's confession, and not when he is indirectly implicated. "Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." Id. This court also has limited the application of *Bruton,* stating that "extrajudicial statements or confessions by one defendant which do not directly inculpate the codefendant are not within the prohibition of *Bruton* . . . and are admissible." *State* v. *Cosgrove,* 181 Conn. 562, 591, 436 A.2d 33 (1980); accord *State* v. *John,* 210 Conn. 652, 679, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

Here, Gomez' statement did not directly implicate or even mention Booth. Gomez neither confessed to the crime himself nor incriminated Booth or Brown in his statement. Instead, Gomez asserted only that he was not present when the murder was committed. While the weakness of Gomez' alibi implicates Gomez in the

crime, it does not implicate Brown or Booth. The evidence indirectly corroborates Smith's testimony that Booth had instructed the four men to fabricate alibis, but the introduction of this evidence does not warrant a separate trial. "It would impair both the efficiency and the fairness of the criminal justice system to require, in all cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Richardson* v. *Marsh*, supra, 481 U.S. 210. The trial court specifically instructed the jury to consider the alibi only with respect to Gomez. Booth has failed to demonstrate how he was actually prejudiced by the evidence concerning Gomez' alibi. Accordingly, we reject Booth's claim that the introduction of Gomez' alibi into evidence deprived him of his sixth amendment right to confront witnesses.

Booth also argues that the introduction of Gomez' statement highlighted their antagonistic defenses, since Booth claimed that Smith committed the murder while, according to Gomez' alibi, Smith and Gomez were not at the apartment building on the night of the murder. We disagree.

Gomez' alibi was not part of his defense, but was part of the state's case against Gomez, to which Gomez objected. Gomez did not argue to the jury that his alibi was true. Rather, Gomez claimed that the state had failed to produce sufficient evidence for the jury to convict him of the crimes with which he was charged. The court explicitly instructed the jury that Gomez' alibi was offered only in the case against Gomez and that it could not be considered in the case against Booth. Under these circumstances, we reject Booth's claim

that the admission of Gomez' statement substantially prejudiced Booth, rendering the joint trial improper.

## C

Gomez argues that he was substantially prejudiced during the trial by the admission into evidence of Booth's statements to police, reporters and Valentin, as well as the admission of Booth's prior convictions. During the state's cross-examination of Booth, Booth admitted that he had been convicted of a felony in October, 1989, that he had been convicted of either the sale or possession of narcotics with intent to sell in September, 1992, and that he had been convicted of at least one other felony for which he had served prison time. According to Gomez, these felony convictions, along with Booth's many out-of-court statements that were admitted into evidence, prejudiced his trial by creating a "rub off" effect of guilt by association. Gomez argues that, with so much evidence having been introduced at trial that was not admissible against Gomez, the jury could not possibly have followed the court's instructions and disregarded the evidence when considering Gomez' case. We disagree.

Some courts have determined that "[t]he dangers of transference of guilt are such that a court should use every safeguard to individualize each defendant in his relation to the mass. . . . Particularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that that guilt will improperly 'rub off' on the others." (Citations omitted; internal quotation marks omitted.) *United States* v. *Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976); see, e.g., *United States* v. *Kelly*, 349 F.2d 720, 759 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S. Ct. 1467, 16 L. Ed. 2d 544 (1966). On these grounds, some courts have held that severance is necessary when one defendant plays a substantially lesser role in the

crime than others. See, e.g., *United States* v. *Mardian*, supra, 980–81 (ordering new trial for defendant based in part on fact that evidence against him was not as strong as that against codefendants); *United States* v. *Branker*, 395 F.2d 881, 888 (2d Cir. 1968), cert. denied sub nom. *Lacey* v. *United States*, 393 U.S. 1029, 89 S. Ct. 639, 21 L. Ed. 2d 573 (1969) (granting new trial for defendants who played minor role in illegal scheme on ground that "[t]his kind of prejudice is particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants"). Other courts have refused to find reversible prejudice when only a small percentage of the evidence is directed against one defendant and that defendant may be hurt by "prejudicial spillover" from the evidence against the codefendants. E.g., *United States* v. *Hernandez*, 85 F.3d 1023, 1029–30 (2d Cir. 1996) (evidence of codefendants' separate crime in which defendant was not involved did not prejudice defendant's trial when jury was instructed not to consider that evidence in case against defendant); *United States* v. *Vaccaro*, 816 F.2d 443, 449 (9th Cir.), cert. denied, 484 U.S. 928, 108 S. Ct. 295, 98 L. Ed. 2d 255 (1987) (finding that severance was not required because, "[a]lthough only a small percentage of the proffered evidence directly implicated [the defendant], a much greater percentage of evidence was relevant to the charges against her because it showed the nature of the scheme in which she was allegedly involved and how the scheme was executed"); *United States* v. *Fortna*, 796 F.2d 724, 737–38 (5th Cir.), cert. denied, 479 U.S. 950, 107 S. Ct. 437, 93 L. Ed. 2d 386 (1986) (defendant not entitled to severance even though his alleged involvement in conspiracy was minimal). Cautionary instructions to the jury concerning what evidence may be considered against which defendant can

often alleviate any potential prejudice. "The 'spillover' effect . . . usually is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the government." (Internal quotation marks omitted.) *United States* v. *Fortna,* supra, 737; see also *United States* v. *Hernandez,* supra, 1029–30 (rejecting claim of prejudicial spillover when trial court "instructed the jury that it was required to consider the evidence against each defendant individually for each count"); *United States* v. *Villegas,* supra, 899 F.2d 1347–48 (finding no merit to claim of prejudicial spillover when "trial court repeatedly stated the importance of considering each defendant separately" [internal quotation marks omitted]).

Gomez has failed to establish that he was prejudiced by the spillover effect, if any, from the admission of Booth's statements to the media, police and Valentin or the admission of Booth's prior convictions. The jury was instructed not to consider the evidence of Booth's convictions and Booth's statements in deciding the case against Gomez, save for Booth's second "parking lot" statement to Valentin.[16] Moreover, the trial court told the jury on numerous occasions to "decide the case against each of these three defendants separately." Again, there is no indication that the jurors could not follow these instructions. Gomez contends that the volume of evidence admitted against Booth but not against Gomez, in combination with the corresponding number of cautionary instructions to the jury, increased the risk of jury confusion. Gomez claims that the jury could not possibly have followed the court's instructions, considering some testimony only in the case against Booth while considering other testimony in the cases against

---

[16] The court did allow the jury to use Booth's second parking lot statement in the case against Gomez. See part IV C of this opinion. Gomez' argument against joinder, however, does not differentiate between this statement and the others.

all three defendants. See part IV C of this opinion. We disagree.

"[I]t is not enough for the defendant to show that a joint trial was less advantageous than a separate trial would have been. Rather, the defendant must prove substantial injustice." *State* v. *White*, supra, 229 Conn. 160–61. We decline to hold that a separate trial is necessary whenever any potentially incriminating evidence against one codefendant is introduced during a joint trial. See *Richardson* v. *Marsh*, supra, 481 U.S. 209–10. In the absence of a showing to the contrary, the jury is presumed to have followed the instructions of the court. *State* v. *Negron*, supra, 221 Conn. 331; see also *Richardson* v. *Marsh*, supra, 206.

Gomez has failed to establish that the jury could not follow the trial court's cautionary instructions, and that he actually was prejudiced by the admission of Booth's extrajudicial statements and prior convictions. The state also produced a substantial amount of evidence implicating Gomez in the crime. See part IV B of this opinion. For these reasons, we find Gomez' claim of jury confusion unavailing and, accordingly, reject the claim that he was substantially prejudiced by the joint trial.[17]

## II

Booth also claims that the trial court improperly instructed the jury that it could use against Booth "any statements made as the three defendants approached or got into the red car at State Pier Road . . . ." Smith testified that, at that time, Brown stated to Booth, Gomez and Smith, "I robbed that nigger too."

Booth argues that, at the time of Brown's statement, the objective of any conspiracy to kill Wattley had been

---

[17] Gomez also argues that the defendants presented antagonistic defenses at trial. We reject this claim for the same reasons we rejected this claim with respect to Brown and Booth. See part I A and B of this opinion.

achieved. Therefore, Booth claims, any statements or admissions made after the objective of the conspiracy was achieved were admissible only against the declarant, not against coconspirators.

The state responds that the conspiracy had not ended when the statement was made because Wattley was still alive moments after the shooting and stabbing, when the defendants fled. Booth testified that the police were just arriving on the scene when he and his companions drove off. The officer who located Wattley determined that he was still breathing.

"[I]t is well established that a coconspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause. *State* v. *Spencer*, 198 Conn. 506, 513, 503 A.2d 1165 (1986) . . . . *State* v. *Pelletier*, 209 Conn. 564, 577, 552 A.2d 805 (1989); see also *Bourjaily* v. *United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)." (Internal quotation marks omitted.) *State* v. *Couture*, 218 Conn. 309, 322, 589 A.2d 343 (1991).

Booth relies on *United States* v. *Serrano*, 870 F.2d 1, 9 (1st Cir. 1989), and *United States* v. *Vowiell*, 869 F.2d 1264, 1267 (9th Cir. 1989), in support of his argument. We addressed a similar argument in *Couture*, in which we discussed these cases. In analyzing *Vowiell*, we stated in *Couture* that "the main objective of the conspiracy was to escape from prison. The conspiracy was deemed to have ended when the escapees reached a place of temporary safety; [id.], 1268–70; and the coconspirator statements made thereafter were ruled inadmissible because they took place outside the scope of the conspiracy. Id. In *Serrano*, the statements in question were made in an attempt to conceal a conspiracy that had long since collapsed. See *United States* v.

*Serrano,* supra, 7–9. As in *Vowiell,* the *Serrano* court ruled the statements inadmissible because the chief aim of the conspiracy was past when the statements were made. Id., 9. But see *United States* v. *Medina,* 761 F.2d 12, 18 (1st Cir. 1985) (conspiracy continued so long as coconspirators were acting together to destroy incriminating evidence)." *State* v. *Couture,* supra, 218 Conn. 323. We determined that, although these cases factually limited "the general rule rendering coconspirators' statements admissible"; id.; this limitation was inapplicable in *Couture* because the conspiracy in *Couture* was ongoing when the statement in question was made. Id., 323–24.

First, we consider whether the conspiracy had terminated when Brown made the statement at issue. "[A] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any co-conspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . ." 3 F. Wharton, Criminal Evidence (14th Ed. Torcia 1987) § 609, pp. 739–40, citing *Dutton* v. *Evans,* 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); *United States* v. *Medina,* supra, 761 F.2d 12; *United States* v. *Zabic,* 745 F.2d 464 (7th Cir. 1984). We conclude that there was evidence that the conspiracy had not ended, as the four men were fleeing the scene together to avoid the police while Wattley was still alive. Their armed presence at the scene would be, of course, incriminating evidence, and the plan to murder Wattley necessarily involved the conspirators' attempt to evade immediate discovery.

Smith testified that Brown made this statement to Booth as they fled the crime scene. Under these circumstances, the statement itself was admissible as a statement made to Booth. "A statement made out of court is not hearsay unless it is offered to establish the truth

of the facts contained in the statement." *State* v. *James*, 211 Conn. 555, 576, 560 A.2d 426 (1989); accord *State* v. *Esposito*, 223 Conn. 299, 315, 613 A.2d 242 (1992). The truth of Brown's statement was irrelevant to its admissibility. The statement made to Booth was itself evidence of the conspiracy to kill Wattley in which Booth played a part.

### III

In addition to his claims concerning joinder, Brown makes the following four claims:[18] (1) improper admission of hearsay evidence concerning Brown's membership in 20 Love; (2) improper refusal to allow Brown to recall Waterson for further questioning regarding her answers to questions during direct examination by the state; (3) improper admission into evidence of the results of scientific tests; and (4) juror misconduct. We reject these claims.

### A

Brown argues that the trial court improperly allowed Waterson to testify that Brown was a member of 20 Love. The following additional facts are necessary to resolve this issue. During direct examination, the state's attorney asked Waterson if, during July, 1995, she had known any member of 20 Love. Brown objected to this

---

[18] Brown's brief ends with a blanket statement purporting to join in the claims of his codefendants as those claims apply to him; the one claim that might apply to him is Gomez' hearsay argument, addressed in part IV C of this opinion. We decline to review Gomez' final claim with respect to the case against Brown, however, as Brown has not briefed the issue adequately. See, e.g., *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 38, 717 A.2d 77 (1998) ("[i]ssues that have not adequately been briefed may be deemed abandoned"). Brown addressed neither in his brief nor at oral argument how the introduction of Booth's statements prejudiced Brown's case specifically, and merely joining in Gomez' claim to this effect is insufficient. We, therefore, refuse to review, for purposes of the case against Brown, the trial court's ruling with respect to Booth's parking lot statements to Valentin.

question, claiming a lack of adequate basis, and the court overruled the objection. Waterson responded that the three defendants were members of the 20 Love gang. When the prosecutor asked how she knew this information, Waterson answered: "They all used to hang around playing Nintendo games," and "from my brother." At this point, the three defendants objected and asked the court to strike the entire line of testimony from the record. The court overruled the defendants' objections.

During cross-examination by Brown, Waterson admitted that her sole knowledge as to who might be in 20 Love came from her brother, who Waterson acknowledged "brags about stuff that he doesn't know about." Brown then asked Waterson: "As you sit there right now, isn't it possible that you are mistaken . . . ?" Waterson responded: "I could be because I don't know for a fact."

On appeal, Brown argues that, because Waterson did not have firsthand knowledge of Brown's alleged gang affiliation, her testimony regarding Brown's membership in 20 Love was hearsay that did not fall within any exception to the hearsay rule. According to Brown, his alleged membership in the gang provided the motive for him to aid in Wattley's murder, and Waterson's testimony that he was a member was damaging to him. Citing *State* v. *Outlaw*, 216 Conn. 492, 503, 582 A.2d 751 (1990), Brown contends that his conviction must be reversed because the admission of Waterson's testimony violated the confrontation clauses of both the state[19] and federal constitutions, and was not harmless. We disagree.

Brown's reliance on *Outlaw* for the assertion that the improper admission of hearsay has constitutional

[19] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

ramifications is misplaced. In *Outlaw*, we stated that "[c]ases involving the admission of *an unavailable declarant's prior statements of identification* [give] rise to Confrontation Clause issues because hearsay evidence was admitted as substantive evidence against the [defendant]." (Emphasis added; internal quotation marks omitted.) Id. The court did not find that the improper admission of *any* hearsay necessarily violates the confrontation clause. In fact, this court has concluded the opposite numerous times. See, e.g., *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997) ("[t]his court has held that admission of statements that are either irrelevant or impermissible hearsay is not a constitutional error"); *State* v. *Robinson*, 213 Conn. 243, 259, 567 A.2d 1173 (1989) (improper admission of hearsay does not necessarily amount to constitutional error).

"Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *McIntyre*, supra, 242 Conn. 329; accord *State* v. *Cavell*, supra, 235 Conn. 721–22. "The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" *State* v. *Brown*, 199 Conn. 14, 25, 505 A.2d 690 (1986); accord *State* v. *Gonzales*, 196 Conn. 115, 119, 491 A.2d 1067 (1985).

Even if we assume that the trial court improperly admitted Waterson's testimony regarding Brown's membership in 20 Love, Brown has not established that the testimony actually affected the outcome of his trial. In effect, Waterson withdrew her testimony that Brown was a member of 20 Love. Her testimony was that the source of her information, her brother, was not reliable,

and that she could have been mistaken as she did not know "for a fact" that Brown was a gang member. This testimony amounted to a retraction of her testimony on direct examination. Furthermore, there was other testimony concerning Brown's alleged gang membership that properly was admitted at trial. "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." *Swenson* v. *Sawoska*, 215 Conn. 148, 155, 575 A.2d 206 (1990). Smith testified that Brown was a member of 20 Love. Smith stated that he knew this because Brown had told him so. There was also testimony that Brown may not have been a member of 20 Love.[20] The jury was free to evaluate the credibility of the witnesses and the basis for each witness' testimony in order to determine whether Brown was a member of 20 Love. In light of the other evidence regarding Brown's gang membership, the admission of Waterson's testimony, even if improper, was not reversible error.

B

Brown also argues that the trial court improperly refused to allow him to recall Waterson as a witness for his defense in order to question her further with respect to her testimony for the state. We disagree.

The following additional facts are necessary to resolve this issue. When the state's attorney called Waterson to the stand, she testified that, on July 13, 1995, Gomez was driving her car. Waterson further testified that Gomez was supposed to pick her up from work at 9:30 p.m., but he never arrived; as a result, Waterson took a cab home. Waterson testified that Gomez called her later that night and told her that he had been drinking and could no longer drive her car.

---

[20] Booth testified that Brown "[is] not and never has been a member of 20 Love," but later included Brown as one of the people whom he, as president of 20 Love, led and felt a duty to protect.

According to Waterson, Gomez asked her to pick up the car. Waterson testified that she called a cab and instructed the driver to drop her off one street away from where her "blue station wagon" was parked.[21] She testified that she waited for the cabdriver to leave and then walked over to her car.

During cross-examination by Gomez, Waterson testified that she had lied to the cabdriver because she had "had problems with cabdrivers before and [did not] trust them." Waterson testified that she had been stalked by a cabdriver. Brown did not cross-examine Waterson about her reasons for her statements to the cabdriver. On redirect examination by the state, Waterson reiterated that she lied because she does not trust cabdrivers.

After the state rested, Brown attempted to recall Waterson during his case-in-chief to question her further about her reasons for mistrusting cabdrivers. The prosecutor objected, stating that Brown should have raised the issue on cross-examination, and that it was not appropriate to call Waterson as a witness for his defense in order to elicit this "irrelevant [and] immaterial" testimony.[22] Brown responded that he did not cross-examine Waterson about her mistrust of cabdrivers because he did not know the reasons for her fear when she testified for the state. Brown stated that he

---

[21] Waterson admitted, during direct examination by the state, that she had lied to the cabdriver:

"Q. What did you tell the cabdriver?

"A. I had told him [that] I had a blue station wagon and my friend lived over there.

"Q. So you lied to the cabdriver?

"A. Yes."

[22] The state made a motion in limine to prevent Brown from calling Waterson to testify further about her mistrust of cabdrivers. The prosecutor referred to Waterson's potential testimony as "irrelevant, immaterial and not an appropriate matter for presentation during [Brown's] case-in-chief." The court granted the state's motion.

had learned of the reason for her mistrust of cabdrivers only after she had testified for the state.[23] Brown argued that, since the state implied that Waterson had lied because she knew something about the murder,[24] recalling Waterson to the stand to discuss her true reasons for the lie was crucial to his case. The court sustained the state's objection. Brown later made an offer of proof concerning Waterson's testimony.[25]

[23] Brown stated: "Judge, with respect to what I'm offering, afterwards I talked to her. What is this, you don't trust cabdrivers? And she explained the situation which now makes perfect sense. A certain cabdriver had amorous intentions with respect to her. Those amorous intentions were unwanted. It seemed as though every time she called for a cab, that particular cabdriver came and continued to talk about his crush on her. She felt that all the other cabdrivers in the company, whenever a call would come in from her, would let him know so that he could pick her up. He had no idea that she had [a] new car. She didn't want him to know she had [a new] car, so she lied and didn't report back to the cabdriver. All of a sudden, her distrust makes sense and is an innocent instance of what the prosecutor wants to view as an attempted concealment."

[24] The following colloquy developed between the state and Waterson:
"Q. After [you] got out of the cab, what did you do?
"A. I waited for the cabdriver to leave and then I proceeded to my car.
"Q. You were being secretive, were you not?
"A. I wouldn't call it secretive."

[25] The court stated that "[t]he record should reflect that immediately after . . . Booth rested, there was a side bar, at which time [Brown] indicated he would rest but he wanted to make an offer of proof. He told me what that offer of proof was, and I told him I would not allow that testimony. In order that the record on behalf of . . . Brown be preserved, would you make that offer of proof now?"
Brown responded: "Yes, Your Honor. . . . I had intended to call . . . Waterson to the stand. She testified during the course of the [state's] case that she did not trust cabdrivers. After she testified to that, I talked to her in the corridor to find out why she testified [to] that [effect, to which she responded that although] an amorous cabdriver had made various advances, none of them [was] so improper to be reported to the police, but they were embarrassing and unwanted nonetheless. Each time she called for the cab, that cabdriver would appear. She came to believe that the other cabdrivers and dispatchers were steering her calls toward that particular cabdriver. She didn't want the cabdriver to know that she had a new car [or] what car she had, and [she] was worried that [that] particular cabdriver who drove her there that night might report it to him. And that's why she said she did not trust cabdrivers."

Brown claims that the trial court's refusal to allow him to recall Waterson in his case-in-chief not only violated an evidentiary rule, but also violated his right to present a defense as guaranteed under article first, § 8, of the constitution of Connecticut and the sixth and fourteenth amendments to the United States constitution.[26] We disagree.

"The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." (Citations omitted; internal quotation marks omitted.) *State* v. *Asherman*, 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "[T]he decision whether to cross-examine a witness is almost always a purely tactical one." *State* v. *Clark*, 170 Conn. 273, 286, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976). "When a party chooses not to cross-examine a witness in order to avoid the possibility of eliciting harmful testimony, his right to confront and cross-examine that witness as guaranteed by the sixth and fourteenth amendments of the United States constitution is in no way abridged." *State* v. *Villafane*, 171 Conn. 644, 676, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds, *State* v. *Stepney*, 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); see *State* v. *Fullwood*, 199 Conn. 281, 286, 507 A.2d 85 (1986).

---

[26] Despite his invocation of the state constitution, Brown offers no adequate and independent analysis of his state constitutional claim. We, therefore, consider only his claim under the federal constitution. See, e.g., *State* v. *Dyson*, 238 Conn. 784, 794, 680 A.2d 1306 (1996).

During cross-examination, Gomez asked Waterson about her mistrust of cabdrivers, and she responded that she had been stalked by a cabdriver. Brown cross-examined Waterson after Gomez had elicited this information, but Brown nevertheless chose not to cross-examine Waterson specifically about her mistrust of cabdrivers. His decision not to cross-examine Waterson on this issue did not deprive Brown of his constitutional right to confront the witness.

When Brown tried to recall Waterson to explore further her mistrust of cabdrivers, it was within the trial court's discretion to disallow the testimony. "[T]he trial court is vested with considerable discretion in controlling the mode and order of interrogating witnesses . . . ." *Gomeau* v. *Gomeau*, 242 Conn. 202, 209, 698 A.2d 818 (1997). "The issue on appeal is not whether any one of us, sitting as the trial court, would have permitted the disputed testimony to be introduced. The question is rather whether the trial court . . . abused its discretion in not allowing the rebuttal testimony . . . ." (Internal quotation marks omitted.) Id.; cf. *Hall* v. *Burns*, 213 Conn. 446, 451, 569 A.2d 10 (1990).

The trial court did not abuse its discretion in refusing Brown's request to recall Waterson in his case-in-chief. The trial court reasonably could have found that Waterson's proposed testimony was directed toward a collateral matter that was not relevant to the merits of Brown's case. There was no testimony linking Brown to any conversations with Waterson before she picked up her car. "It is a reasonable exercise of judicial discretion to exclude questions which would introduce . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Talton*, 197 Conn. 280, 284–85, 497 A.2d 35 (1985). In addition, the court reasonably could

have found that the evidence was cumulative, because Waterson had testified that she had been stalked by a cabdriver. It is within the trial court's discretion to exclude cumulative evidence. *State* v. *Watley*, 195 Conn. 485, 490, 488 A.2d 1245 (1985); see *Verrastro* v. *Middlesex Ins. Co.*, 207 Conn. 179, 187–88, 540 A.2d 693 (1988). In light of the other evidence presented at trial, Brown has not established that he was substantially prejudiced by his inability to recall Waterson to testify.

C

Brown also argues that the trial court improperly admitted into evidence scientific samples taken from Waterson's car and the results of tests conducted upon such samples. The following additional facts are necessary to resolve this claim. State police detective John Turner testified that, on the morning of July 26, 1995, he took samples from a red Mitsubishi that had been impounded at the New London police department. Turner testified that he had found two blood-like spots on the car, which he "swabbed" and sent to the laboratory for analysis. In addition, Turner had conducted a gunshot residue test on the steering wheel, in order to determine whether any driver of the car recently had discharged a firearm. Over the objections of all three defendants,[27] the court admitted into evidence the results of these laboratory tests.

Forensic scientist Robert O'Brien testified concerning these results. He stated that the gunshot residue test on the steering wheel was positive, indicating that a driver of the vehicle had fired a handgun. O'Brien also concluded that one of the spots on the car had

[27] Brown stated: "Now, I approached the bench with other counsel joining me. I argued to Your Honor a prejudicial impact outweighing the probative effect. . . . We pointed out that these tests were taken thirteen days after the murder itself. And that the state has no, no way, obviously, enough and conclusively enough to say exactly where that car had been between the time of the death and the time the tests were taken."

tested positive for human tissue or blood, but that it could not be typed definitively.

On appeal, Brown argues that the trial court abused its discretion in admitting the results of the gunshot residue test and the blood stain analysis into evidence. According to Brown, the relevance of this scientific evidence "was minimal," the car having been tested thirteen days after the murder and having been driven by a number of people in that time, while its prejudicial effect and capacity to confuse the jury were "great." Brown contends that, because its probative value does not outweigh its prejudicial impact, the trial court improperly admitted this evidence. We disagree.

"It is well established that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996); see *State* v. *Sauris*, 227 Conn. 389, 406–407, 631 A.2d 238 (1993).

"There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2)

where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982); accord *State* v. *Greene*, 209 Conn. 458, 478–79, 551 A.2d 1231 (1988).

We conclude that the trial court did not abuse its discretion in admitting into evidence the results of the gunshot residue test and the blood stain analysis. The gunshot residue test results were relevant, as the car was used on the night of the murder and the test results tended to show that a driver may have fired a weapon. The passage of time and the intervening use of the vehicle go to the weight of the evidence, not its admissibility. The jury was aware that the samples were not retrieved immediately after the murder, and that the results may have been affected by the passage of time and the intervening use of the car. Turner testified that the gunshot residue test and the blood stain samples were not retrieved until July 26, 1995, thirteen days after Wattley's murder. Turner also testified that certain types of trace evidence, such as gunshot residue, tend to dissipate over time.[28] O'Brien admitted that the passage of time and the possibility of tampering can affect

---

[28] The state questioned Turner as follows:

"Q. [D]o certain types of trace evidence tend to dissipate over time?

"A. Yes.

"Q. So, in that sense, would the passage of time complicate the search?

"A. Yes.

"Q. Or at least the potential results of the search?

"A. Yes.

\* \* \*

"Q. And again, as the passage of thirteen days creates some, at least, potential problems of dissipation of evidence with respect to that?

"A. With a [gunshot residue] kit? Yes, it is."

the reliability of gunshot residue tests.[29] O'Brien also testified with respect to the effect that the passage of time would have on the blood stain samples.[30] Waterson testified that, during that time, the car had been driven to the Carolinas, and that many people had come into contact with the steering wheel during the trip. Waterson also testified that it had rained during the trip, and that the rain had washed some things onto and off of the car.

From this testimony, the jury was aware that the test results might have been affected by the passage of time and the trip to the Carolinas. The jury, therefore, could have considered these facts when deciding what weight to give the test results during their deliberations. None of the factors that generally indicate prejudice; see *State v. DeMatteo*, supra, 186 Conn. 702–703; was present in this case, and the trial court reasonably could have found that the prejudicial effect of this evidence did not outweigh its probative value. Therefore, the trial court did not abuse its discretion in allowing the test results into evidence.

### D

Brown finally claims that he was prejudiced by juror misconduct because one juror admittedly read two

[29] With respect to the gunshot residue test, O'Brien testified: "The bottom line is, this is a very tender material, it can be washed off, rubbed off [or] transferred. Time [and] conditions play a factor too in determining this material."

[30] With respect to the blood stain samples, the state questioned O'Brien as follows:

"Q. . . . [I]s there a period of time after which it's not a good idea to test a stain to see if it's blood or body fluid?

"A. Well, it's always worth a try.

"Q. And in your experience, have you identified body fluids many months after?

"A. Absolutely. It depends on the degradation of the blood itself, the environment, the conditions, the texture, where it's been, that type of thing: obvious, common sense things."

newspaper articles about the trial before a verdict was rendered. Brown filed a motion for a judgment of acquittal or for a new trial based, inter alia, on this misconduct. Thirteen days after the jury rendered the guilty verdicts, the trial court held a hearing to determine whether the juror had engaged in misconduct by reading the two articles in violation of the court's instructions. At the hearing, the juror admitted that she had read one article before the trial began but after she had been selected as a juror on the case and after the trial court had cautioned the jurors not to read anything about the case. The article was entitled "Gang murder trial to start Monday," and briefly discussed the allegations in the case. The juror stated that she never had mentioned the article or any of its contents to any of the other jurors. She also denied being influenced by the article.

The second article, of which the juror read only one paragraph, related to an incident that had occurred at the courthouse on October 24, 1996, as the jurors were leaving for the day. Someone reported seeing an individual with a gun fleeing from the courthouse parking lot. Police discovered that the individual was a child with a toy gun. On October 25, 1996, the next day, the trial court advised the jury of this incident, in order to allay any fears or concerns they may have had. At the juror misconduct hearing, the juror stated that she "just wanted to know if it was in the paper," and asked her husband about it, who pointed out the paragraph to her. She denied that anything she had read in that article influenced her decision in the case. The trial court concluded that, while it was improper for the juror to disobey the court's instructions, the misconduct had not influenced her or her fellow jurors' impartiality in the case.

Brown, who sought to disprove his membership in 20 Love, claims that the pretrial article "was devastating." He argues that the article's assertions that Brown

was a member of 20 Love must have had an influence on the juror. The trial court denied Brown's motion for a judgment of acquittal or for a new trial.

"A defendant is entitled to have an impartial jury decide his case solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court. . . . It is well established, however, that not every incident of juror misconduct requires a new trial. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . Where, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct. . . . *State* v. *Newsome*, 238 Conn. 588, 627–28, 682 A.2d 972 (1996).

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e have . . . accordingly confined our role to a determination of whether there has been an abuse of discretion. *State* v. *Hammond*, 221 Conn. 264, 269–70, 604 A.2d 793 (1992). Claims of juror misconduct fall within this rule of limited review. *State* v. *Asherman*, [supra, 193 Conn. 735–36]. . . . *State* v. *Ross*, 230 Conn. 183, 227–28, 646 A.2d 1318 (1994), cert.

denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

"The trial court was not implicated in the defendant's charge of juror misconduct and, therefore, the defendant bore not only the burden of proving misconduct, but also the burden of proving the prejudicial impact of that misconduct. *State* v. *Newsome*, supra, 238 Conn. 628." (Internal quotation marks omitted.) *State* v. *Small*, 242 Conn. 93, 112–13, 700 A.2d 617 (1997).

Assuming without deciding that the juror's actions in this case amounted to misconduct, we are persuaded that the trial court properly concluded that Brown failed to prove that any prejudice had inured to him as a result. The juror testified that she did not discuss the articles with any other juror and that the articles did not influence her. The trial court found the juror's testimony credible. Based upon the record, we conclude that the trial court properly denied Brown's motion for a judgment of acquittal or for a new trial based on juror misconduct.

IV

Gomez makes three additional claims on appeal. First, he contends that, at the probable cause hearing, the trial court improperly found that probable cause existed to believe that Gomez intended to murder Wattley. Second, Gomez argues that the state produced insufficient evidence at the trial to sustain his convictions. Third, Gomez alleges that the trial court improperly allowed the jury to consider Booth's statements to Valentin in the case against Gomez.

A

Gomez argues that the trial court improperly found probable cause[31] that he had the intent to murder Wattley. The following additional facts are necessary to

---

[31] Article first, § 8, of the constitution of Connecticut, as amended by article twenty-nine of the amendments, and General Statutes § 54-46a, require that

resolve this issue. On March, 13, 1996, the trial court conducted a hearing to determine if there was probable cause that Gomez committed the crimes of murder in violation of § 53a-54a, and felony murder in violation of § 53a-54c.[32] Although the information also charged Gomez with conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a, that charge, which does not carry a possible sentence of death or life imprisonment, was not at issue at the hearing. See *State* v. *Patterson*, 213 Conn. 708, 712, 570 A.2d 174 (1990).

At the conclusion of the probable cause hearing, the court reasonably could have found the following. Smith and Wattley had fought at a party in early July, 1995, and Wattley had cut Smith with a razor. The injury was not serious. Approximately two weeks later, Gomez and Brown had picked up Smith at the house of Smith's mother. The three men then drove to Booth's apartment. When they arrived there, Booth had told the others that he had arranged for Wattley to come to the building, and that Smith and Wattley were going to fight. After a few hours, Valentin called to say that Wattley was on his way, and the four men then exited the building. Before leaving the building, Brown and Booth put on gloves and Booth had secured a knife. Booth also asked Brown if he was wearing gloves when he "loaded it."

After the four men exited the building, Smith and Booth went to the south side of the building, while Brown and Gomez went to the north side. When Wattley arrived, he entered the building on the north side, where Brown and Gomez were situated. Smith and Booth then entered the building on the south side and began

a defendant receive a probable cause hearing before being tried for any crime punishable by death or life imprisonment.

[32] Gomez originally objected to the court's finding that there was probable cause that he committed both felony murder and murder, but the felony murder charge was not pursued during the trial. Therefore, his appeal focuses on the alleged lack of probable cause that he committed murder.

ascending the stairs. Smith and Booth heard gunshots below and started running to exit the building. As they descended the stairs, they saw Wattley, lying in the doorway on the second floor and bleeding profusely. Booth then leaned over and stabbed Wattley a few times. Smith and Booth exited the building and ran toward Waterson's car. The four men then entered the car, with Gomez in the driver's seat. As Gomez drove away, Brown stated to the others: "I robbed that nigger too."

On appeal, Gomez argues that the trial court improperly found probable cause that he had the requisite intent to commit murder. Gomez claims that, because there was no direct evidence establishing that Gomez had overheard Booth ask Brown if he wore gloves when he "loaded it," or that Gomez had seen Booth take the knife from the kitchen, there was no direct evidence establishing that Gomez was aware that Brown and Booth had weapons. According to Gomez, his mere presence at the scene of the crime does not indicate that he had the intent to murder Wattley; instead, he could have been there merely to aid Smith in a fight against Wattley. Gomez claims that the only evidence directly implicating him in the crime was the testimony of Smith, as a state's witness at the probable cause hearing, that Gomez had picked him up at his mother's house and had driven him to Booth's apartment, and that Gomez had driven the getaway car. Gomez argues that driving the car is insufficient to prove that he had the intent to murder Wattley, or that he even knew that Brown and Booth intended to murder him. We disagree.

"In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially

less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992). "On appellate review of a probable cause hearing, we must examine the evidence presented to the trial court at that hearing and determine whether it was sufficient to warrant a person of reasonable caution to believe that the accused had committed the charged offense." *State* v. *Greenfield*, 228 Conn. 62, 74, 634 A.2d 879 (1993).

We conclude that the evidence presented at the hearing was sufficient to establish probable cause that Gomez participated in the murder. Although Gomez is correct that there was no direct evidence of his intent to kill Wattley, the trial court could have inferred such intent from the evidence. See *State* v. *Patterson*, supra, 213 Conn. 721–22. "[I]ntent is often inferred from . . . the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 257, 681 A.2d 922 (1996). This court has held that when a person flees the crime scene with other participants in a crime, it is reasonable to infer that that person had the intent to murder. See, e.g., *State* v. *Mitchell*, 200 Conn. 323, 337, 512 A.2d 140 (1986) ("it was reasonable for the trial court to draw the inference that [the defendant] would not have fled with the assailants and remained in their company unless he was also involved"). Driving an escape vehicle and aiding principal perpetrators to escape the crime scene also indicate the intent that the crime should occur. See *State* v. *Findlay*, 198 Conn. 328, 333–34, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90

L. Ed. 2d 721 (1986) (upholding conviction for robbery based on evidence that defendant drove getaway car).

In this case, the court reasonably could have inferred from the evidence that Gomez had the intent to murder Wattley. The evidence indicates, with substantial certainty, that Gomez had the intent to murder Wattley. Moreover, Brown and Gomez were situated on the south side of the building, where Wattley entered, and fled the building together after the shots had been fired. Thus, the trial court properly found probable cause that Gomez committed murder.

B

Gomez also argues that the state produced insufficient evidence at trial to sustain his convictions. According to Gomez, his murder conviction must be overturned because there was insufficient evidence from which the jury could have concluded beyond a reasonable doubt that he possessed an intent to kill Wattley. In addition, Gomez argues that his conspiracy conviction must be overturned because there was insufficient evidence to establish that he had both the intent to kill and knowledge of the goals of the conspiracy. We disagree.

"In reviewing [a] sufficiency [of the evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Moreover, [t]his court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom." (Citations omitted; internal

quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996); see also *State* v. *Greenfield*, supra, 228 Conn. 76. "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Tomasko*, supra, 238 Conn. 258. Moreover, "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

"In order to be convicted under our murder statute, the defendant must possess the specific intent to cause the death of the victim. . . . To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." *State* v. *Stanley*, 223 Conn. 674, 678, 613 A.2d 788 (1992); accord *State* v. *Greenfield*, supra, 228 Conn. 76. "To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 543, 679 A.2d 902 (1996); see General Statutes § 53a-8. Thus, intent is a necessary

element to the crime of murder whether the defendant is the principal or merely an accessory.

Gomez argues that the state failed to produce sufficient evidence that he had the intent to cause death. Because there was no direct evidence that Gomez, himself, actually shot or stabbed Wattley, Gomez argues that, at most, he could be found guilty under an accessory theory of liability. Gomez also argues that the jury could have concluded that he was unaware of the fact that Brown and Booth were bringing weapons to the meeting with Wattley and that Gomez did not even know that Wattley would be killed. Because intent to cause death is a necessary element of accessory liability, Gomez contends that his murder conviction must be overturned. We disagree.

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Tomasko*, supra, 238 Conn. 257. "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 236 Conn. 197.

On the basis of the evidence presented and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that Gomez had the intent to cause Wattley's death. Evidence adduced at trial established that Gomez was present in Booth's apartment prior to the murder. There was also evidence that Brown had a loaded gun when Gomez, Brown and Booth were at Booth's apartment, and that, when they left the apartment together to await Wattley's arrival,

Booth took along a knife. Smith testified that Brown and Gomez, who were connected by cellular telephone to Booth, positioned themselves at the north end of the building. When Wattley arrived at the scene, he had entered the building at the north end. Shortly thereafter, Smith heard the gunshots and saw Wattley lying in the hallway below. According to Smith, Gomez fled the building with the others and drove the getaway car that had been parked nearby.[33] From this evidence, the jury reasonably could have inferred that Gomez knew about the weapons and the intention to kill Wattley. Driving the getaway car and aiding principal perpetrators to escape the crime scene also indicate an intent that the crime should occur. See *State* v. *Findlay*, supra, 198 Conn. 333–34. In addition, there was testimony undermining Gomez' statement to the police, and the jury reasonably could have concluded that Gomez lied to the police to cover up his part in the crime. See, e.g., *State* v. *McIntyre*, supra, 242 Conn. 326–27 (evidence of similar alibis aids fact finder in determining whether codefendants committed crime and then tried to conceal it); *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990) ("[t]he state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty" [internal quotation marks omitted]). On the basis of the evidence presented and the reasonable inferences drawn therefrom, the jury reasonably could have found that Gomez possessed the intent required for a conviction of murder.

We also conclude that there was sufficient evidence for the jury to convict Gomez of conspiracy to commit murder. "To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was

---

[33] Gunshot residue also was found on the steering wheel of Waterson's car.

made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 220 Conn. 602, 606–607, 600 A.2d 1330 (1991).

Gomez argues that his conspiracy conviction must be overturned because there was insufficient evidence to prove that he had the knowledge and intent to cause Wattley's death. We disagree. The jury reasonably could have inferred from the evidence that Gomez knew about the plan to murder Wattley and that he possessed the intent to kill as well. The jury could have found that Gomez was in Booth's apartment when Booth asked Brown if he wore gloves when he "loaded it," that Gomez then accompanied the others to meet Wattley, coordinated their movements by cellular telephone before the shooting and stabbing, and drove the others across town fleeing the murder scene. There was sufficient evidence establishing that Gomez knew about the plan to murder Wattley and participated in it. See *State* v. *Torres*, 242 Conn. 485, 499, 698 A.2d 898 (1997) (gang membership, attendance at gang meetings, presence at scene with others and voice communication over radio sufficient evidence that defendant knew about and participated in conspiracy to commit murder). The jury also could have found that Gomez' statement to the police was false, and that he had lied to cover up his own participation in the conspiracy. On the basis of the evidence and the reasonable inferences drawn therefrom, we conclude that there was sufficient evidence to support Gomez' conviction of conspiracy to commit murder.

## C

Finally, Gomez claims that the trial court improperly allowed the jury to use Booth's statements to Valentin in the parking lot of her building in the case against Gomez. In the first such statement, made on the night of the murder, Booth told Valentin that they shot "him" and that Booth knew that, if Valentin had known they were going to shoot Wattley, she would not have helped lure Wattley to the building. In the second such statement, made a few days after the murder, Booth told Valentin to continue to refrain from telling the police what she knew.

The following additional facts are necessary to resolve this claim. When Booth's statements were admitted into evidence, the jury was instructed to use them only in the case against Booth. At the conclusion of the evidence, however, the court reversed itself in part after determining that sufficient evidence had been presented to establish that a conspiracy existed. The court charged: "Statements made by any one of the defendants on . . . July 13, 1995, or in the early hours of July . . . 14, 1995, may be used by you in . . . your consideration of the cases of all three defendants, and not just in the case of the defendant who is alleged to have made the statement." The trial court clarified this charge with a discrete list of five statements that the jury could use against each defendant: "[A]nything which was said in . . . Booth's apartment on July 13, 1995, any statements made as the three defendants approached or got into [Valentin's] car . . . anything that was said in the cemetery . . . [and the] statement allegedly made to . . . Valentin when she was dropped off after . . . questioning by [the police] several days

later." Booth's first statement to Valentin was not among those statements.[34]

Gomez claims that the ruling as to the second statement was harmful error. However, Gomez did not object to the admission of this statement in the case against him. After the court charged the jury in accordance with its ruling, Booth objected to the court's charge allowing the jury to use Brown's statement that he robbed Wattley against Booth, because, according to Booth, "the conspiracy ended when the death occurred." Booth concluded, stating "[s]o those are my exceptions," and Gomez simply indicated that he "would just join them."[35] Booth, of course, did not take exception to the court's charge allowing the jury to use Booth's own statements to Valentin against the other defendants. Accordingly, we conclude that Gomez did not object at trial to the admission of the second statement against him. We, therefore, need not review this unpreserved claim of error.

Gomez argues alternatively that, even if we do not determine that he objected to the second statement, its admission warrants review under Practice Book § 60-5,[36] because of the statement's importance to the case and the likelihood that it caused substantial injustice.

[34] The state's argument, with regard to the first parking lot statement, is that the trial court never reversed itself as to its admissibility in the case against Gomez. We agree and address only Gomez' claim as to the second parking lot statement.

[35] Gomez argues that what he meant by this statement is that he intended to join Brown, who had objected to the admission of Booth's second parking lot statement five days earlier in the trial. The transcript clearly indicates, however, that Gomez said he "would just join them" immediately following Booth's statement that "those are my exceptions." Therefore, we reject Gomez' assertion that he objected to the admission of Booth's statements in the case against him.

[36] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

"Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 502, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997).

Gomez argues that the trial court committed plain error in admitting the second statement under the coconspirator exception to the hearsay rule because the conspiracy had ended before Booth made the statement. The state argues, to the contrary, that the conspiracy was ongoing because Booth's second parking lot statement to Valentin indicated a continuing effort to conceal the crime. We agree with the state.

The concoction of alibis is additional evidence of efforts to conceal the crime. Smith testified that, after the four men drove from the crime scene and were walking through a cemetery, Booth told the others that, if questioned, Booth and Brown would say that they had been together, and Booth told Smith and Gomez to come up with an alibi. Smith further testified that, the day after the murder, the four men went to the house of Gomez' mother to discuss their alibis. Smith testified that, in the presence of Booth and Brown, Smith and Gomez agreed to say that they were playing video games most of the night and then went to Lucky's bar at approximately 10 p.m. As we stated in part II of this opinion, "a subsequent declaration of a conspirator may be admissible against any co-conspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . ." 3 F. Wharton, supra, § 609, pp. 739–40. We conclude that there was evidence that the conspiracy was still ongoing when Booth made the second statement to Valentin. Thus, the admission of this statement against Gomez was in accordance with the requirement that

the conspiracy be ongoing when the hearsay statement is made. See *State* v. *Couture*, supra, 218 Conn. 322.

Furthermore, Gomez suffered no harm from the statement's admission against him. Gomez argues that the admission of the statement operated as a substantial injustice in that it provided the jury with the opportunity to consider it as evidence of Gomez conspiring to murder Wattley. We disagree. Booth's warning to Valentin simply did not suggest that Gomez took part in the murder or the conspiracy. We conclude that the admission of the second statement in the case against Gomez did not affect the fairness or integrity of Gomez' trial. Based on our review of the trial record, we are not persuaded that the trial court's admission of the second parking lot statement against Gomez as a coconspirator constituted plain error.

Gomez also requests review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because he asserts he was denied his due process right to a fair trial. In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id. "This court has held that admission of statements that are either irrelevant or impermissible hearsay is not a constitutional error. See

*State* v. *Robinson*, [supra, 213 Conn. 257]." *State* v. *McIntyre*, supra, 242 Conn. 329. We conclude that Gomez' claim does not allege a violation of constitutional magnitude, did not deprive Gomez of a fair trial and was not harmful to him, as required by the second, third and fourth prongs of *Golding*. See *State* v. *Golding*, supra, 239–40. Therefore, the defendant cannot prevail under *Golding*.

The judgments are affirmed.

In this opinion CALLAHAN, C. J., and BORDEN and KATZ, Js., concurred.

BERDON, J., dissenting. All three defendants, Anthony Booth, Daniel Brown, and Jamie Gomez, claim that the trial court abused its discretion when it granted the state's motion for joinder and denied the defendants' motions to sever. They all claim that the trial resulted in substantial injustice or prejudice. I agree and would reverse the judgments of conviction on the ground that the defendants should have been granted separate trials.[1] Although I disagree with other issues the majority discusses, I will limit this dissent to the prejudice that the defendants suffered by being tried together for the murder of Darrell Wattley.

It is correct, as the majority points out, that the trial court has discretion whether to grant separate trials. That discretion, however, is not unbridled and, in my view, the trial court crossed the line by not ordering a severance. Even if an appellate court concludes that a trial court did not abuse its discretion regarding pretrial motions to join or sever, it also must consider separately whether, as the trial developed, the joinder of the trials resulted in a substantial injustice or prejudice to the defendants. See *State* v. *White*, 229 Conn. 125, 160, 640

[1] In the present case, the egregiousness of the harm caused by the joinder is underscored by the fact that all three defendants were charged with conspiracy to commit murder.

A.2d 572 (1994); *State* v. *DeWitt*, 177 Conn. 637, 646, 419 A.2d 861 (1979). It is well settled that where a defendant proves that substantial injustice has developed, fairness to the accused requires that he be afforded a new trial. *State* v. *Holup*, 167 Conn. 240, 245, 355 A.2d 119 (1974). The defendant also bears the burden of showing that any prejudice that developed as a result of joinder "was beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 38, 671 A.2d 323 (1996).

It is abundantly clear that the trial court in the present case should not have joined for trial these three cases *and* that as the trial progressed, the prejudice against the defendants should readily have been apparent. Therefore, in order to determine whether the defendants each deserve a new, separate trial, I need focus only on the substantial injustices that developed against each defendant during the course of the trial.

I

"[This] Court should be mindful of the serious risks of prejudice and overreaching that are characteristic of joint trials, particularly when a conspiracy count is included in the indictment." *Zafiro* v. *United States*, 506 U.S. 534, 545, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (Stevens, J., concurring), citing *Krulewitch* v. *United States*, 336 U.S. 440, 454, 69 S. Ct. 716, 93 L. Ed. 790 (1949) (Jackson, J., concurring). "The dangers of transference of guilt are such . . . [that cases] requir[e] severance when the evidence against one or more defendants is far more damaging than the evidence against the moving party." (Internal quotation marks omitted.) *United States* v. *Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976), citing *United States* v. *Kelly*, 349 F.2d 720, 756–59 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S. Ct. 1467, 16 L. Ed. 2d 544 (1966). The dangers of

a joint trial of codefendants accused of conspiracy is commonly recognized by courts, several of which have acknowledged that juries are prone to believe the supposed truism that "birds of a feather flock together." See, e.g., *Krulewitch* v. *United States*, supra, 454 (Jackson, J., concurring).

It is well settled that one of the major dangers of a joint trial is that "the 'rub-off' effect of testimony against a co-defendant may sometimes prejudice a defendant, despite an instruction that it is not to be considered against [another codefendant] . . . ." (Citations omitted.) *United States* v. *Zane*, 495 F.2d 683, 694 (2d Cir.), cert. denied, 419 U.S. 895, 95 S. Ct. 174, 42 L. Ed. 2d 139 (1974), citing *Krulewitch* v. *United States*, supra, 336 U.S. 454 (Jackson, J., concurring). The admission of evidence that is probative of a defendant's guilt, but admissible only against a codefendant, can create a substantial injustice to that defendant. See *Zafiro* v. *United States*, supra, 506 U.S. 539. It has been recognized that the mounting proof against one defendant is likely to affect the jury's determination of a codefendant's guilt because "[i]t is also quite easy for the jury to be prejudiced . . . by inferences from an accused's association with other defendants." *United States* v. *Lane*, 474 U.S. 438, 463, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986) (Brennan, J., with whom Blackmun, J., joined, concurring in part and dissenting in part); see also *United States* v. *Branker*, 395 F.2d 881, 888 (2d Cir. 1968), cert. denied, 393 U.S. 1029, 89 S. Ct. 639, 21 L. Ed. 2d 573 (1969). Furthermore, where the court limits the admission of testimony to certain defendants many times, "the effectiveness of such instructions may very well diminish into the point of becoming meaningless." *Erman* v. *State*, 49 Md. App. 605, 434 A.2d 1030, cert. denied, 292 Md. 13 (1981), cert. denied, 456 U.S. 908, 102 S. Ct. 1756, 72 L. Ed. 2d 165 (1982).

Similarly, evidence of a defendant's past convictions and appurtenant sentences may also prejudice a codefendant. The United States Court of Appeals for the Second Circuit has noted that, "[w]e do well to bear in mind the wise counsel of the late Judge Gurfein: 'There are few areas in which it is as important for this court to keep a watchful eye as on the admissibility of similar offenses in a case involving more than a single defendant.' *United States* v. *Rosenwasser*, 550 F.2d 806, 814 (2d Cir.) [Gurfein, J., dissenting], cert. denied, 434 U.S. 825, 98 S. Ct. 73, 54 L. Ed. 2d 83 (1977)." *United States* v. *Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980); see also *Zafiro* v. *United States*, supra, 506 U.S. 539 (explicating danger that evidence of codefendant's wrongdoing erroneously could lead jury to infer defendant was guilty). It is a recognized fact that juries may refuse to believe one defendant is innocent because of his association with a codefendant who has a substantial criminal record. See 2 W. LaFave & J. Israel, Criminal Procedure (1984) § 17.2 (e), p. 371.

In addition to the prejudice created by the rub-off or spillover effect of testimony that is admitted against only one defendant and the related risk of guilt by association with a codefendant who has a criminal record, substantial injustice may also result by a jury's confusion of the evidence. *State* v. *Boscarino*, 204 Conn. 714, 724, 529 A.2d 1260 (1987). As the record becomes more complex, it becomes more difficult for the jury to keep the testimony separate as to each codefendant. *United States* v. *Branker*, supra, 395 F.2d 887–88. Judge Learned Hand warned that in complex situations, the cumulative effect of a judge's limiting instructions is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash* v. *United States*, 54 F.2d 1006, 1007 (2d Cir.), cert. denied, 285 U.S. 556, 52 S. Ct. 457, 76 L. Ed. 945 (1932).

## A

In the present case, Gomez, who did not testify and relied on cross-examinations for his defense, claims that he was substantially prejudiced by the admission of numerous out-of-court statements by Booth that were admissible only against Booth. More specifically, Gomez points to prejudice created by the admission of certain testimony by (1) Detective David Gigliotti, (2) Sergeant Patricia Jones, both of the New London police department, and (3) Matthew Burgard, a newspaper reporter for the New London Day, all of which testimony was admissible only against Booth, but not against Gomez. For example, first, Gigliotti testified that several days after the murder of Wattley, at Booth's apartment, Booth told Gigliotti and Detective Margaret Ackley, also of the New London police department, that he did not have any knowledge of the crime and confirmed that if anything gang-related had occurred, it would have been with Booth's permission, because he was the leader of the New London 20 Love street gang. Gigliotti also testified that approximately one week later Booth came to the police station, at which time he denied having anything to do with Wattley's death.[2] According to Gigliotti, Booth mentioned a Fourth of July party incident during which Wattley allegedly cut James Smith, and stated that Smith was a member of the Groton chapter of 20 Love, and that 20 Love decided at a meeting not to respond to the incident involving Wattley because it was so trivial.[3] Second, Jones testified that while she was booking Booth for his arrest, Booth questioned her why he was the only one arrested, and he then explained to her that "they probably knew that he was the mastermind." Jones also

---

[2] A tape recording of Booth's conversation and a transcript were both admitted at trial.

[3] According to the state, the motive for killing Wattley was retaliation for the Fourth of July incident between Wattley and Smith.

testified that later, while Booth was speaking on the telephone to an unidentified person, he stated that "they didn't know what they were looking for and that they knew he was the mastermind." Finally, Burgard testified that five days after the murder, Booth told him that Booth was concerned about the stories covering the Wattley murder, because they implied that the murder was gang-related. Burgard further testified that Booth explained that Wattley, a member of another street gang named MOB, had cut a 20 Love gang member at a party, but that "none of [the members of 20 Love] were even around when [the murder] happened." In addition, according to Burgard, Booth told him that, as president of the New London chapter of 20 Love, Booth wanted to assure Burgard that Wattley's death was not gang-related, and that if Booth had wanted to retaliate against Wattley, he would have ordered a beating, not a murder.

Gomez asserts there was so much evidence admitted at trial that was not admissible against him that the jury could not have followed the court's limiting instructions, thus creating a "rub-off" effect that denied him a fair trial. Although the relevant testimony was probative only of Booth's guilt, the mounting evidence against Booth increased the likelihood that the jury would not be able to limit the evidence to its determination of Booth's guilt or innocence. This danger was increased by the fact that the association of the codefendants' was relevant at trial because the trial included a conspiracy count. There was testimony at trial that Booth, Brown, and Gomez were cousins who spent a lot of time together and that Booth, Brown, Gomez, and Smith were all members of the 20 Love gang. Finally, both Booth and Smith testified at trial that all four men were together waiting for Wattley on the night of the murder.

Gomez also maintains that he was prejudiced by the admission of evidence of Booth's prior convictions and appurtenant sentences that was admitted against Booth

for impeachment purposes. Booth testified that he was: (1) convicted in October, 1989, of "a felony" for which he received a two year prison sentence; (2) convicted in September, 1992, of either the sale or the possession of narcotics with intent to sell for which he received a ten year prison sentence that was suspended after three years; and (3) possibly convicted of one more felony for which he received additional prison time. The magnitude of this evidence should not be ignored, for it included three felonies, not just one isolated misdemeanor. Furthermore, the court did not give a limiting instruction regarding these prior convictions and appurtenant sentences at the time Booth testified on cross-examination, but, rather, this was done after all three codefendants made their closing arguments. Thus, for a time the jury was mentally free to apply such testimony against all three defendants, not just as impeachment evidence against Booth.

In addition, Gomez claims that the evidence and the appurtenant jury instructions were so complex and confusing that it denied him a fair trial. Throughout the trial, the court limited certain testimony to specific defendants. The complexity of the court's limiting instructions was compounded by the fact that the court changed its instructions regarding certain testimony. For example, the court originally instructed the jury to use against Booth alone, Booth's statements to Ackley and/or Gigliotti and his statement to Angeline Valentin[4] as she was dropped off after questioning by the police. More than one week later, after the state successfully moved to have certain evidence admissible against all three defendants because of the conspiracy counts, the court changed its instructions. The court explained that its earlier "instructions hold true now but with some

---

[4] According to the testimony at trial, Valentin, Booth's neighbor, at the request of Booth, had invited Wattley to her apartment on the night of the murder.

exceptions which I'm going to expressly define right now. Statements made by any one of the defendants on . . . July 13, 1995, or in the early hours of July 14, 1995, may be used by you in considering—in your consideration of the case of all three defendants, and not just in the case of the defendant who is alleged to have made the statement. . . . The statements which may be used by you in all three cases, that is against all three defendants, includ[e] [1] anything which was said in [Booth's] apartment on July 13, 1995, [2] any statements made as the three defendants approached or got into the red car at State Pier Road, [3] anything that was said in the cemetery, [4] [any] statement allegedly made in the parking lot to Detective Gigliotti by [Booth] having to do with checking and taking a head count [and] . . . [5] [any] statement allegedly made to [Valentin] when she was dropped off after her questioning by Detective Gigliotti several days later." Consequently, some testimony regarding certain defendants' out-of-court statements to specific individuals was admissible only against the declarant, while other testimony regarding different statements by the same defendant to the same person or persons was admissible against all three codefendants. For example, testimony regarding Booth's alleged statements to Gigliotti in the parking lot in the hours after the murder was admissible against all three codefendants, while testimony regarding his statements to Ackley and/or Gigliotti in Booth's apartment and at the police station was admissible only against Booth.

The exact wording of the instructions further complicated the situation. For example, the use of the word "including" before describing the relevant statements could have implied that the list was incomplete. See The American Heritage Dictionary (3d Ed. 1992) ("[i]nclude . . . more often implies an incomplete listing"). The majority, however, confronts this issue, and concludes

that the court presented a complete list. As a result, the majority maintains that Booth's first parking lot statement to Valentin—that "we" shot him and that if Valentin had known "we" were going to shoot Wattley, Valentin never would have helped bring him to the building—was not admissible against all three codefendants because it was not specifically listed by the trial court. The statement does, however, fall under the general category in the trial court's instructions of "[s]tatements made by any one of the defendants on . . . July 13, 1995, or in the early hours of July 14, 1995 . . . ."[5] It is not clear even on appellate review whether the court's list was illustrative or complete. This example alone demonstrates just how complex and confusing the court's instructions were and highlights the fact that such confusion created a substantial injustice to Gomez.[6] If the list was actually only illustrative, that would mean that if a juror remembered incorrectly that a certain statement was made in that time period, he or she would have applied it to all three defendants. Lastly, the list included some statements—such as "anything which was said in Anthony Booth's apartment on July 13, 1995, any statements made as the three defendants approached or got into the red car at State Pier Road, anything that was said at the cemetery"— that had never been subject to limiting instructions, and others that had been limited previously.

Taken as a whole; see, e.g., *State* v. *Faust*, 237 Conn. 454, 473–74, 678 A.2d 910 (1996) (appellate courts should read instructions as whole); these corrective instructions would bewilder the mind of any juror, let alone a juror who has just sat through a long, complicated trial that entailed continual limiting instructions.

[5] If the statement is admissible against only Booth, it is further evidence of the rub-off effect.

[6] As I discuss in part I B of this dissent, this confusion equally prejudiced Brown.

The confusion that these instructions caused jurors who sat on the panel becomes readily apparent, when merely reading the trial transcript of these corrective instructions boggles the mind of the reader.

On the basis of the amount of highly prejudicial admitted testimony and the admission of Booth's prior convictions and appurtenant sentences, which testimony and evidence was admissible only against Booth, in conjunction with the complexity of and potential confusion over the trial court's limiting instructions, I conclude that the joint trial resulted in substantial prejudice to Gomez. Accordingly, Gomez's conviction should be reversed and a new, separate trial should be ordered.

B

The prejudice described in part I A applies equally to Brown, who also did not testify or call any witnesses at trial. In addition, Brown claims that he was prejudiced by a significant piece of evidence—the admission of the testimony of Detective Joseph Gaynor of the New London police department regarding Gomez' out-of-court statements establishing an alibi for the night of the murder, testimony which was admitted only against Gomez. Gomez' alibi was so completely discredited at trial that it corroborated Smith's testimony. Smith, who was allegedly with the three codefendants on the night of the murder, but was not himself a codefendant, testified for the state that after the murder, Booth told Gomez, Brown, and Smith to fabricate alibis. By crediting the testimony of Smith, the state's main witness, Gomez' alibi implicated all three defendants. The jury, however, was supposed to apply this evidence only against Gomez.

On the basis of the aggregate prejudicial effect of this evidence and the evidence previously discussed in part I A of this opinion, I conclude that the joint trial resulted in substantial injustice to Brown as well.

Accordingly, Booth's conviction should be reversed and a new, separate trial should be ordered.

## C

Booth, who did testify at trial, also claims that he was prejudiced substantially by the developments at trial. Booth argues that he was prejudiced by the testimony regarding Gomez' alibi. It is not realistic to expect the jury to connect Gomez' alibi to Smith's testimony without applying it to Brown and Booth. Moreover, in Booth's case, the alibi is directly contrary to Booth's own testimony at trial that on the night of the murder, all four men were waiting for Wattley in Booth's apartment in order to beat him up, but that when Wattley entered the building, Booth and Smith were waiting for him at the wrong entrance and Brown and Gomez had gone to the store. Moreover, at trial Booth denied any discussion regarding alibis. The sheer magnitude of the effect of Gomez' alibi was enough to prejudice Booth substantially.

Accordingly, Booth's conviction should be reversed and a new, separate trial should be ordered.

## II

By failing to grant separate trials, all three defendants were prejudiced.[7] This court should be mindful of the long-standing warning from the United States Supreme Court that serious risks of prejudice and overreaching that prevent a jury from making reliable decisions about guilt or innocence are characteristic of joint trials, particularly when conspiracy charges are involved. *Zafiro* v. *United States*, supra, 506 U.S. 545 (Stevens, J., concurring), citing *Krulewitch* v. *United States*, supra, 336 U.S. 454 (Jackson, J., concurring). As the Supreme Court has

---

[7] The "mental gymnastics" required of the jury to sort out what was admissible against one defendant and not against the others was simply beyond the ability of the average juror.

astutely cautioned, "there is much more at stake here than administrative convenience." *Zafiro* v. *United States*, supra, 545 (Stevens, J., concurring).

Accordingly, I dissent.

### IN RE EDEN F. ET AL.*
### (SC 15965)†

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.**

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Reporter of Judicial Decisions

† Reargument denied. *In re Eden F.*, 250 Conn. 924–25, 741 A.2d 873 (1999).

** The listing of justices reflects their seniority status on this court as of the date of oral argument.